**Case No. 14-1099**
**Consolidated with Case No. 14-1115**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**FORTUNA ENTERPRISES, L.P.,**

**Petitioner**

**v.**

**NATIONAL LABOR RELATIONS BOARD,**

**Respondent**

**UNITE HERE LOCAL 11,**

**Intervenor**

ON PETITION FOR REVIEW OF AN ORDER
ISSUED BY THE NATIONAL LABOR RELATIONS BOARD

**BRIEF FOR PETITIONER FORTUNA ENTERPRISES, L.P.**

Stephen R. Lueke, Bar No. 115906
Stefan H. Black, Bar No. 284499
FORD & HARRISON, LLP
350 South Grand Avenue, Suite 2300
Los Angeles, California 90071
Telephone:  (213) 237-2400
Facsimile:   (213) 237-2401
Attorneys for Petitioner
FORTUNA ENTERPRISES, L.P.

## CORPORATE DISCLOSURE

Fortuna Enterprises, L.P. is a limited partnership. The general partner is Universal Fortuna Investment, Inc. The limited partners are CXL (USA) Ltd., Conara (USA) Inc., Beaumore Development (USA) Inc., Perfect Lead Investment (USA) Ltd., Elia Tse Yi Chang, and KCMS Management Co. Ltd. Fortuna Enterprises, L.P. certifies that it has no parent company and that no publicly-held company has a 10 percent or greater ownership interest in it.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    Parties and Amici

1.    Fortuna Enterprises, L.P., d/b/a The Los Angeles Airport Hilton and Towers ("Fortuna") was the Respondent before the Board and is the Petitioner and Cross-Respondent on appeal. Fortuna is represented by Stephen R. Lueke and Stefan H. Black from the law firm of Ford & Harrison, LLP.

2.    The National Labor Relations Board (the "Board") is the Respondent and Cross-Petitioner on appeal. Its General Counsel was a party before the Board. The Board is represented by Linda Dreeben, Deputy Associate General Counsel for the Board, Kira Dellinger Vol, and Doug Callahan.

3.    UNITE HERE, Local 11 (the "Union") was the Charging Party before the Board and is the Intervenor on appeal. The Union is represented by Eric B. Myers from the law firm of Davis, Cowell & Bowe, LLP.

B.    Rulings Under Review

The ruling under review is the May 30, 2014 Second Supplemental Decision and Order issued by the Board in Case Nos. 31-CA-027837, 31-CA-027954, and 31-CA-028011.  The decision is reported at 360 NLRB No. 128 (May 30, 2014).

C.    Related Cases

This case was previously before the United States Court of Appeals for the District of Columbia Circuit (the "Court") on two occasions.  In 2009, Fortuna petitioned this Court to review two Orders issued by the Board: *Fortuna Enterprises, L.P.*, 354 NLRB 202 (Apr. 30, 2009) and *Fortuna Enterprises, L.P.*, 354 NLRB 843 (Oct. 29, 2009).  *See Fortuna Enters., L.P. v. NLRB*, 09-1136 (D.C. Cir. 2009).  On August 19, 2010, the Board moved to dismiss the case in light of the Supreme Court's decision in *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010).  The Court granted the motion and remanded the case to the Board.

On August 24, 2010, the Board affirmed its previous decision.  *Fortuna Enters., L.P.*, 355 NLRB 602 (Aug. 24, 2010).  On September 1, 2010, Fortuna petitioned this Court to review the Board's August 24, 2010 Decision and Order.  *See Fortuna Enters. v. NLRB*, 10-1272 and 10-1298 (D.C. Cir. 2010).  The Court's decision is reported at *Fortuna Enterprises, L.P. v. NLRB*, 665 F.3d 1295 (D.C. Cir. 2011).

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF JURISDICTION ............................................................. 1

II.  STATEMENT OF THE ISSUE ................................................................... 2

III. RELEVANT STATUTORY AND REGULATORY PROVISIONS ........... 2

IV.  STATEMENT OF THE CASE ................................................................... 2

    A.  Initial Proceedings Before the Board ................................................. 2

    B.  Prior Proceedings Before This Court ................................................. 5

    C.  Most Recent Proceedings Before the Board ....................................... 7

V.   STATEMENT OF FACTS ......................................................................... 9

    A.  Fortuna Maintains an Open Door Policy That Allows
        Employees to Raise Both Individual and Group Grievances to
        Management's Attention. ..................................................................... 9

    B.  Occupation of Employee Cafeteria and Suspensions ........................ 12

    C.  The Work Stoppage Substantially Interfered with Fortuna's
        Operations ......................................................................................... 17

VI.  SUMMARY OF ARGUMENT .................................................................. 19

VII. STANDING ................................................................................................ 22

VIII. STANDARD OF REVIEW ....................................................................... 22

IX.  ARGUMENT .............................................................................................. 23

    A.  The Board Failed to Give Proper Weight to the Fact That
        Fortuna's Employees Had an Adequate Opportunity to Present
        Grievances to Management. ................................................................ 24

        1.  Fortuna Had an Established Grievance Procedure That
            Employees Had Often Used to Resolve Workplace
            Disputes. ..................................................................................... 24

**TABLE OF CONTENTS**
(continued)

2.    The Board Erred by Determining that the *Fourth* Factor Weighed In Favor of Protection.................................... 27

3.    The Board Erred by Failing to Give Sufficient Weight to the *Seventh* Factor. .................................... 29

B.    The Board Erred By Imposing an Unworkable Standard for the *Third Quietflex* Factor. .................................... 32

C.    The Board Erred By Finding that the Balance of the *Quietflex* Factors Weighed in Favor of Protection. .................................... 36

1.    The *First* Factor Does Not Weigh Strongly in Favor of Protection. .................................... 37

2.    The *Second* Factor Does Not Weigh Strongly in Favor of Protection. .................................... 38

3.    The *Fifth* Factor Does Not Weigh Strongly in Favor of Protection. .................................... 40

4.    The *Sixth* Factor Does Not Weigh Strongly in Favor of Protection. .................................... 41

5.    The *Eighth* Factor Does Not Weigh Strongly in Favor of Protection. .................................... 43

6.    The *Tenth* Factor Does Not Weigh Strongly in Favor of Protection. .................................... 43

7.    The Board Should Have Determined That the *Quietflex* Factors Favor the Conclusion that the Work Stoppage Was Not Protected.................................... 44

D.    Remand is Inappropriate in This Case .................................... 45

X.    CONCLUSION.................................... 47

# TABLE OF CONTENTS
(continued)

**Page**

STATUTORY ADDENDUM ..................................................................... 48

CERTIFICATE OF COMPLIANCE......................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Cambro Mfg. Co.,
312 NLRB 634 (1993) ........................................................................ 23, 25, 30-31

City Dodge Center,
289 NLRB 194 (1998) .................................................................................. 38

*Cone Mills Corp. v. NLRB,
413 F.2d 445 (4th Cir. 1969) ............................................................... 25, 30-31

Crenlo, Div. of GF Business Equipment, Inc. v. NLRB,
529 F.2d 201 (8th Cir. 1975) ......................................................................... 23

Fla. Power & Light v. Lorion,
470 U.S. 729 (1985) ................................................................................. 45-45

Fortuna Enterprises, L.P. v. NLRB,
665 F.3d 1295 (D.C. Cir. 2011) ............................................................. passim

Fortuna Enterprises, L.P.,
354 NLRB 202 (Apr. 30, 2009) ............................................................ 2, 4-5, 19

Fortuna Enterprises, L.P.,
354 NLRB 843 (Oct. 29, 2009) ........................................................................ 2

Fortuna Enters., L.P.,
355 NLRB 602 (Aug. 24, 2010) ....................................................................... 5

Fortuna Enters. L.P.,
360 NLRB No. 128 (May 30, 2014) ......................................................... passim

Molon Motor & Coil, Co.,
302 NLRB 138 (1991) .................................................................................. 44

*Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

## CASES [cont'd]

*New Process Steel, L.P. v. NLRB,*
   560 U.S. 674 (2010)................................................................ 5, 7

*NLRB v. Babcock & Wilcox Co.,*
   351 U.S. 105 (1956)................................................................ 21, 23

*NLRB v. Fansteel Metallurgical Corporation,*
   306 U.S. 240 (1939)................................................................ 39

*NLRB v. J. Weingarten, Inc.,*
   420 U.S. 251 (1976)................................................................ 23

*NLRB v. Washington Aluminum Co.,*
   370 U.S. 9 (1962)................................................................ 23, 38

*North Bay Development Disabilities Services, Inc. v. NLRB,*
   905 F.2d 476 (D.C. Cir. 1990)................................................................ 22

*Peck, Incorporated,*
   226 NLRB 1174 (1976) ................................................................ 37

*Pepsi-Cola Bottling Company of Miami, Inc. v. NLRB,*
   449 F.2d 824 (5th Cir. 1979) ................................................................ 24-25

*PHT, Inc. v. NLRB,*
   920 F.2d 71 (D.C. Cir. 1990) ................................................................ 22

*\*Quietflex Manufacturing Company, L.P.,*
   344 NLRB 1055 (2005) ................................................................ *passim*

*Roseville Dodge, Inc. v. NLRB,*
   882 F.2d 1355 (8th Cir. 1989) ................................................................ 24-25, 38-39

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

## CASES [cont'd]

*Sierra Club v. EPA,*
    346 F.3d 955 (9th Cir. 2003) ............................................................. 46

\**Waco, Inc.,*
    273 NLRB 746 (1984) ............................................................ 41, 42

## STATUTES

National Labor Relations Act
    29 U.S.C. §§ 151, et seq. ................................................................... 1, 48
    Section 2(2)—29 U.S.C. § 152(2) ................................................... 22, 48
    Section 7—29 U.S.C. § 157 ................................................................ 48
    Section 8(a)(1)—29 U.S.C. § 158(a)(1) ..................................... 2, 46-48
    Section 8(a)(3)—29 U.S.C. § 158(a)(3) ............................................ 48
    Section 10(a)—29 U.S.C. § 160(a) ................................................. 1, 48
    Section 10(e)—29 U.S.C. §§ 160(e) ............................................... 1, 49
    Section 10(f)—29 U.S.C. § 160(f) ......................................... 1, 22, 50

## I.    STATEMENT OF JURISDICTION

This case is before the Court on the Petition for Review filed by Fortuna Enterprises, L.P., d/b/a The Los Angeles Airport Hilton and Towers ("Fortuna") and on the cross-application filed by the National Labor Relations Board (the "Board") to enforce the Board's May 30, 2014 Second Supplemental Decision and Order.   UNITE HERE, Local 11 (the "Union") has intervened in this appeal in support of the Board.

The Board had subject-matter jurisdiction of the underlying proceedings under Section 10(a) of the National Labor Relations Act (the "Act"), as amended. 29 U.S.C. §§ 151, 160(a).  This Court has jurisdiction over this appeal pursuant to Section 10(e) and (f) of the Act, 29 U.S.C. §§ 160(e) and 160(f), which provide that petitions for review of Board orders may be filed in this Court and that the Board may cross-apply for enforcement of its orders.

The Board's Second Supplemental Decision and Order issued on May 30, 2014 is final with respect to all parties and disposes of all parties' claims.  Fortuna filed its Petition for Review on June 5, 2014.  The Union intervened on June 13, 2014.  The Board filed its Cross-Application for Enforcement on June 19, 2014. The Petition for Review and the Cross-Application for Enforcement are timely because the Act contains no time limit on the institution of proceedings to review or enforce Board orders.

## II.   STATEMENT OF THE ISSUE

Both the Board and the Supreme Court of the United States recognize that employers may protect their private property from undue interference caused by on-site work stoppages.   In this case, 77 of Fortuna's employees gathered in Fortuna's cafeteria and refused to work for two hours and forty minutes, even though they had access to an effective group grievance procedure and even though they were warned on numerous occasions to leave the premises or face disciplinary action.  Did Fortuna violate Section 8(a)(1) of the National Labor Relations Act by suspending the employees who engaged in the work stoppage?

## III.   RELEVANT STATUTORY AND REGULATORY PROVISIONS

The pertinent statutes and regulations are set forth in the attached addendum.

## IV.   STATEMENT OF THE CASE

### A.   Initial Proceedings Before the Board

On May 11, 2006, 77 employees seized Fortuna's cafeteria for almost three hours as part of an on-site work stoppage to protest the pending discipline of a fellow employee.  Fortuna suspended the employees who engaged in the work stoppage because they refused, after numerous warnings, to either return to work or continue their protest off-property.

The Union filed an unfair labor practice charge with the Board alleging, *inter alia,* that Fortuna violated Section 8(a)(1) of the Act by suspending the 77

employees who engaged in the work stoppage. (G.C. Ex.[1] 1(a)-1(j).) Following the issuance of a complaint by the Board's General Counsel, the matter was tried before Administrative Law Judge John J. McCarrick (the "ALJ"). (G.C. Ex. 1(k).) On October 21, 2008, the ALJ issued his decision. (ALJ Decision, Oct. 21, 2008, Case Nos. 31-CA-027837, 31-CA-027954, 31-CA-028011.) After applying the ten-factor balancing test set forth in *Quietflex Manufacturing Company, L.P.*, 344 NLRB 1055 (2005), the ALJ concluded that Fortuna's decision to suspend the employees who engaged in the work stoppage was unlawful. (ALJ Decision, Oct. 21, 2008 at *13-17.) The ten factors in the test are as follows:

(1)   The reason the employees have stopped working;

(2)   Whether the work stoppage was peaceful;

(3)   Whether the work stoppage interfered with production, or deprived the employer with access to its property;

(4)   Whether employees had adequate opportunity to present grievances to management;

(5)   Whether employees were given any warning that they must leave the premises or face discharge;

(6)   The duration of the work stoppage;

(7)   Whether employees were represented or had an established grievance procedure;

---

[1] Exhibits introduced by the Board's General Counsel during the underlying trial shall be identified herein as "G.C. Ex. ___."

    (8)    Whether employees remained on the premises beyond their shift;

    (9)    Whether the employees attempted to seize the employer's property; and

    (10)   The reason for which the employees were ultimately discharged.

*Quietflex*, 344 NLRB at 1056-57.

Fortuna and the Union both filed exceptions to the ALJ's decision. (Resp. Exceptions to ALJ's Decision, Dec. 17, 2008.) On April 30, 2009, the Board issued a Decision and Order affirming the ALJ's decision. *Fortuna Enters., L.P.*, 354 NLRB 202 (2009). The Board's April 30, 2009 Decision and Order reads, in pertinent part, as follows:

> Member Schaumber believes that the length of the work stoppage in the cafeteria and the potential for interference with the provision of services there make this a ***close case***. However, he recognizes that current Board precedent supports the judge's finding that the unrepresented employees did not lose the protection of the Act, ***particularly when the Respondent's officials failed to make it clear that the employees would not be able to meet with senior management at that time and would have alternative opportunities to present their concerns.***

354 NLRB at 203 n. 8 (emphasis added).[2]

---

[2] The April 30, 2009 Order also remanded the case to the ALJ for further consideration of an issue not relevant to the case. On July 22, 2009, the ALJ issued his Supplemental Decision reaffirming his previous decision. On October 29, 2009, the Board issued its Supplemental Decision and Order affirming the ALJ's Supplemental Decision.

Fortuna appealed the Board's April 30, 2009 Decision and Order to this Court. *See Fortuna Enters., L.P. v. NLRB*, Case No. 09-1136 (D.C. Cir. 2009). Soon after the appeal was filed, the Board moved to dismiss the case in light of the Supreme Court of the United States' decision in *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010).

On August 19, 2010, this Court granted the Board's motion and remanded the case back to the Board. On August 24, 2010, a properly-constituted panel of the Board issued a Decision and Order reaffirming the ALJ's decision. *Fortuna Enters., L.P.*, 355 NLRB No. 602 (2010).

## B.    Prior Proceedings Before This Court

On September 1, 2010, Fortuna petitioned this Court to review the Board's August 24, 2010 Decision and Order. Although this Court denied Fortuna's Petition for Review with respect to other issues, the Court granted the petition and refused to enforce the Order with respect to Fortuna's decision to suspend the 77 employees who engaged in the work stoppage. *Fortuna Enterprises, L.P. v. NLRB*, 665 F.3d 1295, 1303 (D.C. Cir. 2011.) The Court identified three fundamental problems with the Board's analysis. *First*, while the Court assumed the validity of the *Quietflex* test, the Court questioned the practicality of the ten-factor balancing test, opining that such multi-factor tests rarely yield predictable results. 665 F.3d at 1300.

5

*Second*, the Court questioned how to apply the *Third Quietflex* Factor ("whether the work stoppage interfered with production") in light of the Board's statement in *Quietflex* that "it is not considered an interference with production where the employees do no more than withhold their own services." 665 F.3d at 1301 (quoting 344 NLRB at 1057 n. 6). To illustrate its point, the Court pointed out that under the principle set forth in *Quietflex,* there would be no interference in production if an assembly line had to be shut down because all or half of the employees working on the line walked off the job – a conclusion that the Court characterized as "at odds with reality." *Id.*

*Third*, this Court overturned the Board's findings with respect to the *Fourth* Factor ("whether the employees had an adequate opportunity to present grievances to management") and the *Seventh* Factor ("whether the employees were represented or had an established grievance procedure"). *Id.* at 1302-03. Citing Fortuna's Open Door Policy and Fortuna's implementation of the policy to resolve both individual and group grievances, the Court agreed with Fortuna's argument that it *did* have an established grievance procedure, that the grievance procedure was "widely known and often used," and that as such, "management … had no obligation to inform the employees in the cafeteria that it would hear and consider their concerns in the future." *Id.* at 1302-03. Significantly, this Court identified

6

the availability of a group grievance procedure (or lack thereof) as "the apparently decisive consideration" underlying the Board's 2009 decision. *Id.* at 1303.

Accordingly, the Court granted Fortuna's Petition for Review with respect to the Board's assessment of the May 11 protest and remanded the issue for reconsideration by the Board. *Id.*

### C.    Most Recent Proceedings Before the Board

On May 30, 2014, the Board issued a Second Supplemental Decision and Order reaffirming its prior decision that the May 11 work stoppage was protected at all relevant times and that the resulting suspensions violated Section 8(a)(1) of the Act. *Fortuna Enters. L.P.*, 360 NLRB No. 128 (May 30, 2014). In response to the Court's concerns regarding the application of the *Third Quietflex* Factor, the Board explained that although employees inevitably interfere with production when they withhold their own services, such interference is not sufficient to render the work stoppage less protected. *Id.* at *5. Rather, the Board clarified that the proper focus when applying the *Third* Factor is solely on "whether the striking employees interfere with production or the provision of services by preventing *other employees* who are working from performing their duties." 360 NLRB No. 128 at *5.

With respect to the *Fourth* Factor ("whether employees had an adequate opportunity to present grievances to management"), the Board "accept[ed] the

Court's finding that the employees had access to an established grievance procedure" but, incredibly, still found that the *Fourth* Factor weighed in favor of protection. 360 NLRB No. 128 at \*6. The Board found that even though the employees knew about the grievance procedure, they "reasonably believed that Coonley or Cook might yet meet with them and listen to their grievance" because certain managers provided assurances that they were attempting to reach Coonley and Cook. *Id.*

As for the *Seventh* Factor ("whether employees were represented or had an established grievance procedure"), the Board accepted as the law of the case this Court's finding that Fortuna's Open Door Policy constituted an established grievance procedure. 360 NLRB No. 128 at \*6. However, rather than continue to treat this factor as the "decisive consideration" for resolving this "close case," the Board rebalanced the *Quietflex* factors in an obvious effort to achieve the same outcome as in 2009. *Id.* at \*6-7. Despite the fact that the Board had barely even mentioned the *First, Second, Fifth, Sixth, Eighth,* or *Ninth* Factors in its 2009 decision, the Board concluded, on remand, that these factors "strongly" favored protection of the on-site work stoppage and outweighed the fact that Fortuna offered an alternative means of resolving grievances that did not infringe upon the Hotel's private property interests. *Id.* at \*5-7.

The Board's May 30, 2014 Second Supplemental Decision and Order is the decision currently before this Court on review.

## V.    STATEMENT OF FACTS

### A.    Fortuna Maintains an Open Door Policy That Allows Employees to Raise Both Individual and Group Grievances to Management's Attention.

Fortuna owns and operates the Los Angeles Airport Hilton Hotel & Towers (the "Hotel"). The Hotel has 1,234 guest rooms and employs approximately 700 people. (Tr.[3] 1334, 1851, 2185; R. Ex.[4] 14.)

The Hotel's Team Member Handbook contains an Open Door Policy that reads, in pertinent part, as follows:

> Hilton Los Angeles Airport is proudly committed to maintaining an open door policy. Any discrimination or recrimination against a team member for presenting an issue, problem, or complaint is prohibited.
>
> A team member should always attempt to work out problems with his/her immediate supervisor. If the issue or problems remains unresolved, the team member can seek assistance from his/her department manager, the Director of Human Resources and the General Manager.

(R. Ex. 28 at 16.)

Fortuna's employees have frequently utilized the Open Door Policy to present and successfully resolve *both* individual and group grievances. For

---

[3] References to the trial transcript shall be identified herein as "Tr. ___."
[4] Exhibits introduced by the Respondent / Petitioner Fortuna during the underlying trial shall be identified herein as "R. Ex. ___."

example, in response to employee complaints raised pursuant to the Open Door Policy, Director of Housekeeping Anna Samayoa purchased new carpet/furniture shampooers in 2005, new housekeeping carts in 2006, and an inventory bar code system in 2007. (Tr. 1830-35.) Likewise, in January 2008, she purchased new uniforms after a group of employees requested to change their uniforms from dresses to pants. (Tr. 1832-33.) In 2006, when a group of lobby attendants requested to change their schedule, Samayoa agreed. (Tr. 1835-36.)

Director of Human Resources Sue Trobaugh also addressed employee complaints pursuant to Fortuna's Open Door Policy. In April or May of 2006, in response to a complaint from two service bartenders, Trobaugh returned a barstool that had previously been in their area and purchased the stacking equipment for wine bottles that they requested. (Tr. 2110-13.) In the Fall of 2006, she also obtained additional help for a linen room attendant who requested it. (Tr. 2106-08, 2113.) Later that same year, when a service bartender asked to be promoted to a regular bartender position despite a "bad credit check," Trobaugh agreed to re-run the bartender's credit in six months and eventually promoted him to a regular bartender position. (Tr. 2113-2115.) In December 2006, she also worked with a group of employees to come up with a system to give employees advance notice when the Hotel expected to be slow around the holidays so that employees could plan to take paid time off. (Tr. 2115-2116.)

Chef Rolf Jung also addressed group concerns raised by employees through the Open Door Policy.  In 2006, two cooks complained about the condition of the kitchen's sauté pans, so Chef Jung issued a purchase order for 20 to 24 new pans. (Tr. 1271-74; R. Ex. 13.)  In January and February 2006, when the cooks requested additional forks, spoons, knives, and a pasta cooker, Chef Jung purchased the new items immediately.  (Tr. 1273, 1282; R. Ex. 13.)

Even after the Union initiated its organizing campaign, Fortuna continued to utilize its Open Door Policy to address group grievances.  For instance, in early February 2006, at approximately 8:00 a.m., a group numbering 80 to 120 employees gathered outside of the Director of Housekeeping's office after a pre-shift meeting.  (Tr. 278-82, 338-346, 1815-1829.)  The employees asked Director of Housekeeping Anna Samayoa to contact Coonley.  (Tr. 279-80, 340-44, 1816-18.)  Coonley appeared shortly thereafter and spoke with the group for approximately 5 to 10 minutes, telling them that he was available to any employee but requested that they please set up an appointment to speak with him.  (Tr. 279-280, 340-44, 1822-25.)  The employees dispersed approximately 30 minutes after they had first gathered.  (Tr. 1821, 1825.)  None of the employees who participated in the delegation were disciplined.

### B.     Occupation of Employee Cafeteria and Suspensions

On May 10, 2006, Fortuna placed employee Sergio Reyes on investigatory suspension because he was caught stealing money from guests. (Tr. 550, 2265, 2337.) In response, a group of Reyes's co-workers organized a delegation to be held the next day in the employee cafeteria at the Hotel. (Tr. 284, 408-412, 551.) The employee cafeteria has 1,607 square feet of space and contains 23 tables and 85 chairs. (Tr. 1624-25; R. Ex. 9.)

The next morning, on May 11, 2006 at around 8:00 a.m., approximately 100 of Fortuna's employees left their work areas and gathered in the cafeteria. (Tr. 414, 1862-1866; R. Ex. 24-25.) As Miguel Vargas – one of the leaders of the work stoppage – was leaving his work area, he saw Director of Food & Beverage Tom Cook and said, "Well, we're all leaving. We're going to the cafeteria. And you need to come too." (Tr. 1507-08.) Cook responded: "If you're all leaving, I can't come. I have to take care of the guests in the restaurant." (Tr. 1507-08.)

Given the limited space available in the cafeteria, the employees participating in the delegation were sitting at the tables, standing behind sitting employees, and standing around in the area. (Tr. 1620, 1622; R. Ex. 9.)

At approximately 8:13 a.m., Director of Housekeeping Anna Samayoa, Assistant Director of Housekeeping Jose Cano, and Night Manager / Security Supervisor Luis Gallardo entered the cafeteria and were informed that the

employees wanted to speak to General Manager Grant Coonley or Director of Food & Beverage Tom Cook. (Tr. 1878, 1880.) The employees did not communicate why they wished to speak with Coonley and Cook. (Tr. 1878, 1880.)

At 8:15 a.m., Samayoa called Cook. (Tr. 1880, Ex. R. 24-25.) When he did not respond, Samayoa and the other managers decided to wait in the hallway for further instructions. (Tr. 1884-85; R. Ex. 24-25.)

At 8:26 a.m., Gallardo called Director of Human Resources Sue Trobaugh to determine how to respond to the work stoppage. (Tr. 1630-31, 1886-87; R. Ex. 24-25.) Trobaugh told him to stand by the phone and that she would call him back. (Tr. 1630-1631). A few minutes later, Trobaugh told Gallardo to inform the employees that if they were not on break, they needed to go back to work. (Tr. 1630, 1893.)

At 8:29 a.m., Samayoa and Cano entered the seating area of the cafeteria and told the employees – both in English and in Spanish – that if they were not on break, then they needed to go back to work. (Tr. 1634-35, 1891-94.) Occupation leader Miguel Vargas told Samayoa that they were not moving and that they wanted to speak to Coonley or Cook. (Tr. 1632, 1895-96.) One employee told Samayoa, "No. We're not going anywhere. We're not!" (Tr. 1895-1897.) The employee then turned around to address the group and said, "Nobody moves." (Tr.

13

1895-1897.) Samayoa told the employees that Coonley was not available to meet with them because he was attending a meeting off-property. (Tr. 1896.)

At 8:33 a.m., Gallardo called Trobaugh a second time. (Tr. 1633, 1898; R. Ex. 24-25.) Trobaugh told Gallardo to reiterate to the employees that they needed to return to work if they were not on break. (Tr. 1633.)

At 8:36 a.m., a number of employees *punched in* at the time clock and returned to the cafeteria *while on the clock* rather than return to work. (Tr. 1899-1900; R. Ex. 24-25.)[5]

At 8:44 a.m., Samayoa, Cano, and Gallardo re-entered the seating area of the cafeteria. (Tr. 1901; R. Ex. 24-25.) Samayoa told the employees for the second time, "If you are not on break, you need to go back to work." (Tr. 1633-1635, 1901-1903; R. Ex. 24-25.) The employees, as a group, then loudly shouted, "We're not going anywhere!" (Tr. 1902.) Vargas said, "We're not going nowhere. They can't intimidate us. We don't have to leave. They can't send us home for being down here." (Tr. 1635.) In response to the employees' clear statement that they did not intend to return to work, Samayoa directed them to "clock out and you need to go home." (Tr. 1902-1904.)

---

[5] In concluding that the work stoppage was somehow "protected for its entire duration", the NLRB ignored the fact that striking employees remained on the clock for its entire duration, constituting attempted theft of employer time. 360 NLRB No. 128 at *8.

The employees then started chanting, "Si se puede, si se puede" ("Yes we can") and insisted, "We're not going anywhere." (Tr. 1635, 1903.) It got very loud in the cafeteria. (Tr. 1903.) Vargas said, "We're not going anywhere." (Tr. 1635, 1903.) He then turned to the employees and said, "We're not moving, are we?" (Tr. 1903.) The employees responded in unison, "No, we're not." (Tr. 1903.) Another employee said, "They are trying to intimidate us and they cannot move us." (Tr. 1635-36.) Samayoa repeated three to four times, "If you are not on break, go back to work." (Tr. 1904.)

After that, Gallardo and Samayoa consulted with Trobaugh a third time. (Tr. 1636.) Trobaugh said to inform the employees that if they are not on break, they needed to either return to work or swipe out and go home; otherwise they will be suspended *pending further investigation*. (Tr. 1637-38, 1642.)[6]

At 9:00 a.m. – approximately one hour after the work stoppage began – Samayoa told the employees that they would be suspended *pending investigation* unless they either returned to work or clocked out and left the premises. (Tr. 1637-1638, 1908-1909; R. Ex. 24, 25.)

---

[6] As the term implies, a "suspension pending investigation" is precisely that – a non-disciplinary action that necessarily requires a subsequent "investigation" into whether disciplinary action is actually warranted. Thus, the Board's finding in the case below (relying upon the Administrative Law Judge's conclusion) that "employees were suspended for 'insubordination' and 'refusal to abide by a reasonable request from a manager' when they did not return to work or clock out" inappropriately ignores the reality of what actually occurred on the morning of the cafeteria occupation 306 NLRB No. 128 at *3-4.

Vargas responded that management "cannot suspend us or remove us from the cafeteria." (Tr. 1639.)  He also told the employees not to give their names and to "just stay put."  (Tr. 1639.)  Likewise, another employee told the striking workers not to move or go anywhere.  (Tr. 1640.)  The employees again started clapping and chanting, "Si se puede, si se puede."  (Tr. 1639.)

When the employees refused to return to work or continue their protest off-property, Samayoa, Cano, and Gallardo went one-by-one suspending employees *pending further investigation*.  (Tr. 1643-1644, 1647-1648, 1909; R. Ex. 20.)  Given the chance to return to work, several employees left the cafeteria, returned to work and *were not suspended*.  (Tr. 1644, 1909-1910; R. Ex. 24-25.)

At approximately 9:06 a.m., Director of Security Graham Taylor entered the cafeteria and told the employees that they could not remain in the cafeteria.  (Tr. 1653, 1917.)  Some of the employees continued chanting, "Si se puede, si se puede."  (Tr. 1917.)  Taylor told them that they were trespassing and that he would call police.  (Tr. 1917-1918.)  Vargas said, "We're not going anywhere."  (Tr. 1918.)  He then said in Spanish to the employees, "You see now, they want to turn the police on us."  (Tr. 1918.)  Another union supporter said, "Go ahead and call them.  We're not leaving."  (Tr. 293, 1653.)  A third employee said, "We're not leaving.  Nobody is leaving this area."  (Tr. 293, 1643.)  When the striking

employees remained in the cafeteria, Taylor was forced to call the police.  (Tr. 1653-54, 1918-1920.)

At 10:15 a.m., a delegation of employees informed management that they wanted to return to work.  (Tr. 307-09, 430-31, 1922; R. Ex. 24-25.)  A manager informed the employees that they were suspended and could not return to work.  (Tr. 309-10.)

At 10:40 a.m., Taylor, Samayoa, and two police officers entered the cafeteria, which was still full of employees. (Tr. 436, 1931-37; R. Ex. 24-25.)  When one of the police officers instructed the employees to leave the area, the employees complied and filed out of the cafeteria.  (Tr. 1933-37; R. Ex. 24-25.)

The day after the occupation, the Human Resources Department began interviewing the employees who participated in the cafeteria strike.  (Tr. 2103-2104.)  The final decision to suspend the employees five working days without pay was eventually made by Human Resources and the Department Heads.  (Tr. 1985, 2104-2105.)  The employees were suspended for occupying the cafeteria for two hours and forty minutes despite repeated instructions to return to work or leave the premises.  (Tr. 1996, 2104-05; G.C. 11.)

## C.   The Work Stoppage Substantially Interfered with Fortuna's Operations.

The employees' occupation of Fortuna's employee cafeteria caused numerous adverse effects to Hotel operations.  Management received complaints

from employees legitimately on break, stating that they could not use the cafeteria during the three-hour work stoppage. (Tr. 1544-48, 2095-2098, 2266-67.) In order to provide the non-striking employees with a place to eat and take their rest breaks, Fortuna set up an employee lunchroom in the private dining room. (Tr. 1542-1546, 2097-2098; R. Ex. 7.) To do so, Fortuna had to reassign a private group that had reserved the dining room. (Tr. 1544-1546, 2097-2098.) Even then, the dining room was so small that it could not accommodate all the non-striking employees during lunch. (Tr. 1539-1551, 2097-2099; R. Ex. 7.)

The Hotel's dining outlets were significantly impacted by the work stoppage because all of the Café's servers and all of the Hotel's room service servers participated in the work stoppage. (Tr. 365-366, 412-413, 1507-1510, 1538-1539.) For instance, Fortuna did not have sufficient wait staff to provide an *a la carte* breakfast in its Café and had to provide a buffet breakfast only. (Tr. 1541-1542, 1579.) Cook was compelled to recruit as many as 15-20 employees from various departments – including Cook himself and the Front Desk Manager – to serve guests and bus tables in the Café. (Tr. 1341-1342, 1539-1540, 1553-1554, 1579-1580.)

The Hotel's housekeeping services were also adversely impacted by the occupation. On both May 11 and May 12, the Hotel's occupancy rate was 99.9%, meaning that all but one or two of the Hotel's 1,234 rooms had to be cleaned. (Tr.

1344, 1983; R. Ex. 17.)    But because 43 of the Hotel's 77 room attendants participated in the work stoppage, approximately 500 rooms were not covered. (Tr. 2099.)    Trobaugh called temp agencies and individuals with whom she had worked in the past to obtain additional housekeepers, and Samayoa cleaned guest rooms until 10:00 p.m.  (Tr. 1983, 2099.)    Even then, not all of the rooms were cleaned the day of the work stoppage.  (Tr. 1984.)

## VI.    SUMMARY OF ARGUMENT

The Board's result-driven decision suffers from three fundamental errors. *First*, the Board fails to give sufficient weight to the fact that Fortuna had an established and effective means by which employees could present grievances. The Board's 2009 decision acknowledged that this was a "close case," but ruled in the Union's favor because Fortuna "failed to make it clear that the employees would not be able to meet with senior management at that time and would have alternative opportunities to present their concerns."  354 NLRB at 203 n. 8.  This Court reversed the "apparently decisive consideration" underlying the Board's 2009 decision, reasoning that because Fortuna had a "widely known and often used" grievance procedure, "management therefore had no obligation to inform employees in the cafeteria that it would hear and consider their concerns in the future."  665 F.3d at 1302-03.  On remand, the Board overlooked or ignored the clear directive from this Court and rebalanced the factors such that the previously

"decisive consideration" was now "strongly" outweighed by factors the Board failed to even mention in its original decision.[7]   Such result-driven decision-making is plainly improper.

*Second*, the Board failed to provide a workable standard for the *Third Quietflex* Factor ("whether the work stoppage interfered with production").  The Board proposes that when evaluating the protection afforded to an on-site work stoppage, this Court should ignore any interference caused by the withdrawal of the striking employees' services and focus solely on whether the "striking employees interfere with production or the provision of services by preventing *other* employees who are working from performing their duties."  360 NLRB No. 128 at *5 (emphasis in original). While this standard may be appropriate for manufacturers who can simply shut down an assembly line when a strike occurs, the Board's proposed standard has no practical application to employers in the service industry.  If one segment of a service employer's workforce goes out on strike, the employer, as occurred here, must re-task non-striking employees to perform the work that would have been done by the striking employees.  As such,

---

[7] In its Decision, the Board instead noted the "repeated assurances" given to employees by Samayoa and other managers that they were trying to contact Coonley on the employees' behalf. In fact, the record established that employees were told that Coonley was off property and unavailable. (Tr. 1896.)  Cook was actually in the restaurant doing the work of his striking employees, and informed them, prior to the strike, that he could not leave because he would need to serve restaurant guests in the absence of his striking wait staff.  (Tr. 1507-1508.)  Moreover, established and publicized personnel privacy policies precluded Hotel managers from discussing the matter with striking employees in any event. (Tr. 2049-2050; R. Ex. 28 at p. 58 and 65.)

the striking employees' withdrawal of their services necessarily interferes – and here, dramatically interfered – with the non-striking employees' ability to do their normal work. As a result, the proposed "clarification" offered by the Board is either inappropriate in the services context altogether or weighs heavily in favor of the instant work stoppage ***not*** being protected, given the extensive disruption to the Hotel's services caused by the May 11 work stoppage.

*Third*, and most importantly, the Board's analysis fails to account for the fact that the primary duty when determining the lawfulness of an on-site work stoppage is to accommodate ***both*** the employees' Section 7 rights ***and*** the employer's private property rights such that there is "as little destruction of one as is consistent with the maintenance of the other." *Quietflex,* 344 NLRB at 1058 (quoting *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956)). Fortuna attempted to balance these competing interests by allowing the striking employees to remain on Hotel property for an extended period of time before imposing any disciplinary action. As the work stoppage dragged on, the striking employees' behavior became increasingly disruptive and the employees strongly indicated that they had no intention of leaving the property even after Hotel managers asked them to do so on several occasions. Accordingly, Fortuna was entitled to assert its private property rights and to insist that the employees either present their grievance pursuant to the Hotel's well-known and frequently used Open Door

Policy or continue their protest off-the-clock and off-property, as they had done in the past. As such, the May 11 on-site work stoppage was ***not*** protected and the Board's decision should be reversed.

## VII. STANDING

Fortuna is an employer within the meaning of section 2(2) of the Act. 29 U.S.C. § 152(2). The Board's May 30, 2014 Second Supplemental Decision and Order determined that Fortuna violated the Act by suspending the 77 employees who engaged in the May 11, 2006 work stoppage. The May 30, 2014 Order directs Fortuna to cease and desist from such conduct, post a Notice to Employees, remove from its files any reference to the specified suspensions, and make whole certain employees. Fortuna is therefore an "aggrieved" party within the meaning of section 10(f) of the Act, 29 U.S.C. § 160(f), and thus has standing under that section to seek review of the Board's final order in this Court.

## VIII. STANDARD OF REVIEW

The Board's determinations may be disturbed if "its factual findings are not supported by substantial evidence or it has acted arbitrarily or otherwise erred in applying established law to the facts at issue." *North Bay Development Disabilities Services, Inc. v. NLRB*, 905 F.2d 476, 478 (D.C. Cir. 1990); *PHT, Inc. v. NLRB*, 920 F.2d 71, 73 (D.C. Cir. 1990). The Board cannot depart from

controlling precedent unless it presents a reasoned explanation for its departure. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 265-266 (1976).

## IX.  ARGUMENT

It is undisputed that on-the-job work stoppages may be, under certain circumstances, protected under Section 7 of the Act.  *See NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 15 (1962).  However, "not every such work stoppage is protected."  *Quietflex Mfg. Co.*, 344 NLRB 1055, 1056 (2005).  "At some point, an employer is entitled to exert its private property rights and demand its premises back."  *Id.* (quoting *Cambro Mfg. Co.*, 312 NLRB 634, 635 (1993)).  The U.S. Court of Appeals for the Eighth Circuit has opined that employees' right to remain on an employer's property ends once there is no longer a "sincere effort to meet with management" concerning a workplace grievance.  *Crenlo, Div. of GF Business Equipment, Inc. v. NLRB*, 529 F.2d 201, 204 (8th Cir. 1975).

Because "[t]he precise contours within which [an on-site work stoppage] is protected cannot be defined by hard-and-fast-rules," the Board in *Quietflex* developed a ten-factor test.  *Id.* at 1056.  Thus, to strike an appropriate balance between employees' Section 7 rights and employer's private property rights, "the duty of the Board is to accommodate both rights '***with as little destruction of one as is consistent with the maintenance of the other***.'"  *Id.* at 1058 (emphasis added) (quoting *NLRB v. Babcock & Wilcox Co.*, 351 U.S. at 112 (1956)).  Said

another way, if employees fail to take advantage of an available means by which to exercise their Section 7 rights that does not involve the infringement of the employer's private property rights, the on-site work stoppage is unlawful.

**A.   The Board Failed to Give Proper Weight to the Fact That Fortuna's Employees Had an Adequate Opportunity to Present Grievances to Management.**

      1.   <u>Fortuna Had an Established Grievance Procedure That Employees Had Often Used to Resolve Workplace Disputes.</u>

The most important factor when analyzing whether an on-site work stoppage is protected is whether there is an established grievance procedure by which employees may present group grievances to management.  Because an established grievance procedure allows employees to exercise their Section 7 rights without infringing upon the employer's private property rights, the existence of such a grievance procedure weighs heavily against protecting an on-site work stoppage.

In virtually every case in which the Board has held that an on-site work stoppage was protected, the respondent employer did ***not*** have an established grievance procedure in place.  For instance, in *Roseville Dodge, Inc. v. NLRB,* 882 F.2d 1355 (8th Cir. 1989), and *Pepsi-Cola Bottling Company of Miami, Inc. v. NLRB,* 449 F.2d 824 (5th Cir. 1979), the respective Courts of Appeals enforced the Board's decision that an on-site work stoppage was protected principally because the employer did not have an established grievance procedure.

In contrast, where employers have an established grievance procedure in place, both the Board and the enforcing courts are wary of countenancing any infringement of the employer's private property rights.  In *Cone Mills Corp. v. NLRB,* 413 F.2d 445 (4th Cir. 1969) and *Cambro Manufacturing Company,* 312 NLRB 634 (1993), the respective on-site work stoppages were held ***not*** to be protected in large part because the employees failed to take advantage of an effective existing grievance procedure.  Indeed, in *Cambro*, both the ALJ and the Board cited the existence of the grievance procedure as the primary fact distinguishing the case from *Roseville Dodge* and *Pepsi-Cola*.  312 NLRB at 636.

In this case, it is undisputed (and indeed, the law of the case) that Fortuna's Open Door Policy represented an established and effective grievance procedure that employees frequently utilized to address workplace concerns.  Samayoa utilized the Open Door Policy to address employee complaints regarding cleaning equipment (Tr. 1830-35), uniforms (Tr. 1832-33), inventory practices (Tr. 1835-36), lobby attendant carts (Tr. 1835-36), and work scheduling issues (Tr. 1835-36).  Trobaugh resolved general employment concerns regarding working conditions and promotional opportunities for service bartenders (Tr. 2110-13), for linen room attendants (Tr. 2106-08, 2113), and regarding notification procedures for paid time off (Tr. 2115-16).  Chef Jung testified that Fortuna resolved kitchen employees' concerns regarding the purchase of new kitchen equipment and supplies, such as

egg and sauté pans, cooking utensils, and other kitchen equipment. (Tr. 1271-74.) Even after the Union's organizing campaign began, Fortuna continued to utilize its Open Door Policy to resolve group disputes, as evidenced by the fact that in February 2006, Coonley met with a group of 80 to 120 employees outside the Director of Housekeeping's office. (Tr. 278-82, 338-46, 1815-19.) The employees who engaged in the work stoppage therefore indisputably knew that they could have presented their grievance by scheduling a meeting with management pursuant to the Open Door Policy.

Furthermore, employees could have expressed their protest regarding Reyes's suspension off-property. Throughout the Union's organizing campaign, Fortuna's employees engaged in numerous off-property protests and pickets. (Tr. 1235, 1409, 1639-40, 1787-1788.) Not one of these employees suffered any type of disciplinary action. There is no reason, therefore, that the employees could not have exercised their right to collectively protest Reyes's suspension off-property.

As such, the employees who engaged in the May 11 workplace stoppage had an adequate opportunity to present their grievances to management via an established grievance procedure or via an off-property picketing action. They chose not to utilize those procedures and, instead, seized Fortuna's cafeteria for more than two-and-a-half hours.

2.    The Board Erred by Determining that the *Fourth* Factor Weighed In Favor of Protection.

In light of these facts, it is incredible that the Board found that the *Fourth* Factor ("whether employees had an adequate opportunity to present grievances to management") "weighs slightly in favor of **protection**" (emphasis added).  The Board's decision was predicated primarily on the "repeated assurances given the employees by Samayoa and other managers that they were trying to contact Coonley and Cook on the employees' behalf," which led the employees to "reasonably believe[] that Coonley or Cook might yet meet with them and listen to their grievances."  360 NLRB No. 128 at *6.

The Board's analysis contradicts the previous direction provided by this Court.  This Court held that in light of the existence of an established grievance procedure, Fortuna "had no obligation to inform the employees in the cafeteria that it would hear and consider their concerns in the future."  665 F.3d at 1302. Nevertheless, the Board continues to insist that Fortuna had an affirmative obligation to provide an immediate and definitive response to striking employees' grievances, either in the form of a substantive response or a specific promise to meet to discuss the concerns in the future, which is simply not the law.  The Board's ruling substantially expands the obligations under the *Fourth* Factor (which, up to this point, requires only that employees have an "adequate

27

opportunity" to present grievances to management) and is plainly inconsistent with the directions provided by this Court.

Moreover, the fact of the matter is that striking employees **were informed** of both Coonley's and Cook's inability to meet with them. The employees engaged in the work stoppage could not have reasonably believed that Coonley or Cook might yet meet with them because (1) Samayoa told the employees a full half-hour before the investigatory suspensions were imposed that Coonley was off-property and not available to meet with them (Tr. 1896); and (2) Tom Cook personally told Miguel Vargas **as the strike was just starting** that he could not meet with the employees because he was serving guests in the Café.[8]  (Tr. 1507-1508.)   Because the employees thus knew that Coonley and Cook were not available to meet with them, the work stoppage was not a "sincere effort to meet with management" to discuss a workplace grievance and thus, the employees were required to either continue their protest off-the-clock and off-property or to present their grievance to management through the well-established and frequently-used Open Door Policy.

In short, Fortuna met any obligation the Board's ruling inappropriately seeks to impose.

---

[8] This conversation occurred *prior* to the cafeteria occupation as Vargas left his job duties to join and lead the other strikers. Informing Cook of his plans, Vargas stated: "Well, we're all leaving. We're going to the cafeteria. And you need to come too." Cook responded: "If you're all leaving, I can't come. I have to take care of the guests in the restaurant." (Tr. 1507-08.)

3.    The Board Erred by Failing to Give Sufficient Weight to the *Seventh* Factor.

With respect to the *Seventh* Factor ("whether employees were represented or had an established grievance procedure"), the analysis should be straightforward. *Quietflex* requires that employees' Section 7 rights be balanced against the employer's private property rights "with as little destruction as is consistent with maintenance of the other."   Because Fortuna's employees could freely exercise their Section 7 rights by presenting a group grievance pursuant to Fortuna's Open Door Policy or by engaging in an off-property picketing action – neither of which infringes upon Fortuna's private property rights – the *Seventh* Factor weighs heavily in favor of deeming the work stoppage unprotected.

Indeed, the Board acknowledged the importance of a grievance procedure the first time it considered this case.   In 2009, the Board's (erroneous) determination that Fortuna did not have an established grievance procedure was the "apparently decisive consideration" supporting its decision that the work stoppage was protected.   And yet, after this Court reversed the Board's finding and determined that the Open Door Policy *did* serve as an effective grievance procedure, the Board flip-flopped and determined that the *Seventh* Factor was no longer as significant to its analysis.   Such gamesmanship is inappropriate and should not be condoned by this Court.

Furthermore, the Board's analysis of the *Seventh* Factor on remand is fraught with red herrings and non-sequiturs. The Board begins its analysis by stating that the Act does not require employees to exhaust an employer's internal grievance procedure before striking. While certainly true, this statement does little to advance the analysis of this case. Fortuna is not seeking to prohibit the employees from striking altogether; rather, Fortuna simply objects to its employees striking while ***trespassing*** on its property.

Next, the Board vaguely notes that "on-site work stoppages implicate some distinct considerations," but states that "[t]his does not mean – nor have the Board or the courts ever held – that the Act affords *no* protection to employees who engage in peaceful, non-disruptive on-site work stoppages without first attempting to resolve their complaints through approved channels." 360 NLRB No. 128 at *7. This straw man argument is also unpersuasive. Of course, the existence of an established grievance procedure does not deprive employees of ***all*** protections under the Act. However, according to *Quietflex, Cambro,* and *Cone Mills*, when an employer has implemented an alternative means by which employees can present grievances to management – such as Fortuna's Open Door Policy – ***compelling circumstances*** must exist before employees are allowed to infringe upon their employer's private property rights to conduct even a peaceful and non-obtrusive on-site work stoppage (which this one clearly was not). Such

"compelling circumstances" do not exist here, where the occupation lasted over two-and-a-half hours and the employees refused to comply with the employer's numerous warnings to return to work or leave the property.

The Board then attempted to distinguish the instant case from *Cone Mills* and *Cambro* because the employers in those cases responded to the grievance presented by the employees either by denying the grievance (as in the case of *Cone Mills*) or by definitively stating that a meeting was not immediately possible and offering a future meeting within a matter of hours (as in the case of *Cambro*). 360 NLRB No. 128 at *7-8. In essence, the Board distinguished these cases because Fortuna did not respond to the striking employees' demands or inform the employees that it would hear and consider their concerns in the future. However, that is precisely what this Court determined Fortuna had "no obligation" to do and despite the fact that it had. Thus, this case is not distinguishable from *Cone Mills* or *Cambro* a nd the same result (i.e., a finding that the work stoppage is not protected) is appropriate.[9]

---

9 Furthermore, the Board fails to specify how Fortuna could have possibly responded to the striking employees' grievances when the employees never communicated the specific reasons they were refusing to work. In *Waco, Inc.*, 273 NLRB 746 (1984), the Board cited the fact that the employees "did [not] communicate to the [employer] the particulars of their grievance so as to facilitate a discussion or possible resolution of their concerns" in support of its finding that the work stoppage was not protected. 273 NLRB at 746-47. It follows, therefore, that even if Fortuna had an obligation to respond to a grievance before excluding the grieving employees from the property (and it did not have any such obligation), Fortuna cannot be held liable for not responding to a grievance when the employees failed to specify the nature of their concern in the first place.

For these reasons, the fact that Fortuna's Open Door Policy provides an effective and efficient means by which employees could present grievances without infringing upon Fortuna's private property, the *Fourth* and *Seventh* Factors weigh strongly against finding the work stoppage protected.

### B.    The Board Erred By Imposing an Unworkable Standard for the *Third Quietflex* Factor.

The *Third Quietflex* Factor asks "whether the work stoppage interfered with production, or deprived the employer with access to its property." The Board contends that the Court should not, when analyzing this factor, consider any interference to production caused by the withdrawal of the employees' own services and instead inquire only "whether striking employees interfere with production or the provision of services by preventing *other* employees who are working from performing their duties." 360 NLRB No. 128 at *5. The Board then determined that, in this case, the *Third* Factor favored protection because the "record is devoid of any evidence that the striking employees interfered with the work performance of non-striking employees." 360 NLRB No. 128 at *5.

Once again, the Board is changing the rules in the middle of the game. Under the initial *Quietflex* standard, the issue was whether the work stoppage interfered with the employer's production. Now, the Board purports to change the standard such that this Court may consider only interference caused to non-striking

employees' production.  Such revisionist rulemaking is even more inappropriate given the limited predictive value that the ten-factor *Quietflex* test presently has.

Moreover, the Board's explanation of the *Third* Factor is completely impractical in the service industry.  In the case of a manufacturer, the withdrawal of services by one group of employees does not necessarily adversely affect other employees.  For example, if half the employees on an assembly line go out on strike, the line simply shuts down and there is no adverse impact on the non-striking employees.

However, employers in the service industry do not share the luxury of being able to reduce production when a group of employees goes out on strike.  In the event of a work stoppage, service employers, as here, must re-task non-striking employees away from their normal duties to ensure that the services normally performed by the striking employees are in fact carried out, particularly where a 1,234 room hotel is booked to capacity.

For instance, in this case, Fortuna was facing near 100% capacity on both May 11 and May 12.  To ensure that its guests were served, Fortuna had to re-task a significant portion of its work force – including Food & Beverage Director Tom Cook and its Front Desk Manager – to work in its Café.  (Tr. 1341-1342, 1539-1540, 1553-1554, 1579-1580.)  Even with this re-tasking of certain employees, Fortuna was not able to offer *a la carte* breakfasts to its guests.  (Tr. 1541-1542,

33

1579.)  Similarly, because 43 of Fortuna's 77 housekeepers participated in the work stoppage and the Hotel was at 99.9% capacity on May 11 and May 12, Trobaugh had to utilize temp agencies and individuals with whom she had worked in the past to clean all but one or two of the Hotel's rooms and Director of Housekeeping Samayoa cleaned rooms until 10:00 p.m. (Tr. 1344, 1983-84, 2099; R. Ex. 17.)  Even then, not all of the rooms were cleaned on May 11.[10] (Tr. 1984.)

Fortuna's experience in this matter establishes that, at least in the service industry, the withdrawal of services by striking employees **necessarily** impacts the work performance of non-striking employees.  As such, the Court is therefore left with one of two inescapable conclusions: either the record concerning the extensive disruption to the Hotel's operations demonstrates that the *Third* Factor weighs strongly in Fortuna's favor or the Board's proposed standard for the *Third* Factor is unworkable in the service industry and should be rejected altogether.

Moreover, even if one accepts the Board's "clarification" of the *Third* Factor, there is ample evidence in the record that demonstrates that the employees engaged in the work stoppage adversely affected the working conditions of the non-striking employees beyond simply the withholding of their services.  For instance, the occupation of the cafeteria precluded other employees from making

---

[10] The Board states "although Respondent contends that there were some rooms that were not cleaned, it does not assert that it was unable to provide a clean room to any guest."  360 NLRB No. 128 at *6 fn. 19.  However, it is a simple matter of deduction that if all Hotel rooms were occupied by guests (Tr. 1344, 1983; R. Ex. 17), and not all of the rooms were cleaned, then some guests were not provided a clean room.

use of the cafeteria.  It is a simple matter of arithmetic that if there are 100 people occupying a space with only 85 seats, then the non-striking employees were prevented (or at least substantially deterred) from using the cafeteria.  In an attempt to address the issue, Fortuna set up a temporary employee lunchroom in a private dining room that had previously been reserved by a private group.  (Tr. 1544-1546, 2097-2098.)  However, the private dining room was too small to accommodate all of the Hotel's employees and several employees complained to management that they could not get in to eat their lunch.  (Tr. 1544-48, 2095-2097, 2266-67.)[11] Furthermore, given the raucous nature of the work stoppage, Fortuna had to dedicate three separate managers – Samayoa, Cano, and Gallardo – to observe the striking employees to ensure that their behavior did not escalate.   During this period of time, Samayoa, Cano, and Gallardo were prevented from performing their normal job duties.[12]

As such, the record is replete with instances in which the May 11 work stoppage affected the production of non-striking employees and thus satisfies the Board's own self-serving restatement of the *Third* Factor.

---

[11] The ALJ rejected some, but not all proffered evidence of the employees' complaints on the grounds that they constituted hearsay.  That ruling was erroneous.  The testimony of Fortuna's managers concerning complaints they personally observed is relevant to the managers' state of mind.  Specifically, these complaints – regardless of whether they were true – are relevant to the managers' decision to suspend the employees engaged in the work stoppage.  (Tr. 1544-1548).

[12] Had the work stoppage taken place off-property, Samayoa, Cano, and Gallardo would not have been tasked to observe the protestors.

**C.    The Board Erred By Finding that the Balance of the *Quietflex* Factors Weighed in Favor of Protection.**

Fortuna accepts, as the law of the case, the Court's ruling as to Factors 1, 2, 5, 6, 8, 9, and 10.  However, the Board erred by rebalancing the *Quietflex* factors in a manner that is plainly result-driven.   The concurring opinion submitted by Member Johnson in this case says it best:

> My colleagues respond to the court's remand with a rebalancing of the *Quietflex* factors that gives substantially greater protective weight to many of them than in the Board's prior analysis.  I have doubts that they are entitled to do so under the law of the case here, and further fail to see the basis for such reweighting.  It may be that there are sound reasons for finding that one or more factors now "strongly" support a conclusion that the employees retained statutory protection at the time they were suspended, but I prefer not to join in this characterization without more explanation.

360 NLRB No. 128 at *10.

Further, Member Johnson, in a footnote detailing the shortcomings of the *Quietflex* ten-factor test, also stated as follows:

> Second, as this case demonstrates, the test is fraught with difficulty for remand purposes.   An obvious problem posed by reweighting factors under any multifactor test, much less a 10 factor one, after a case has been remanded to us is the susceptibility to results-oriented analysis.  In other words, colloquially speaking, the Board's reweighting the factors to achieve the same result may seem to the impartial observer more like some analytical version of Whac-A-Mole than reasoned decision-making.

360 NLRB No. 128 at *10 fn. 3.

1.    The *First* Factor Does Not Weigh Strongly in Favor of Protection.

On remand, the Board determined that the *First* Factor ("the reason the employees have stopped working") weighs "strongly" in the Union's favor merely because the employees were protesting the presumed discipline of a co-worker and thus engaged in protected, concerted activity. But surely, the *First* Factor requires more than a showing that the underlying reason for the work stoppage was protected in order to "strongly" weigh in favor of protecting the on-site work stoppage. Indeed, as Member Johnson points out in his concurring opinion, a finding that the underlying reason for the work stoppage was *not* protected would render the entire work stoppage unprotected, without any need for further balancing of the factors. 360 NLRB No. 128 at *10 n. 4.

In past decisions, the Board has looked beyond whether the reason for the work stoppage was protected when analyzing the *First* Factor. For example, in *Peck, Incorporated*, 226 NLRB 1174 (1976), a group of workers stopped working to protest new working conditions. The Board reasoned that because there was no "immediacy of action" concerning the working conditions at issue and the employer had a "clear, immediate interest" in attempting to secure its property, the on-site work stoppage was not protected.

The same analysis applies in this case. When the work stoppage took place, Reyes was simply suspended pending further investigation regarding whether he had actually stolen money. As such, Fortuna's confidentiality policies precluded management from discussing the details of the investigation with Reyes's co-workers – a fact well-known to the striking employees because they had received a copy of the Employee Handbook. (Tr. 2049-2050; R. Ex. 28 at p. 58 and 65.). Thus, there was no "immediacy of action" associated with the reason that prompted the May 11 on-site work stoppage. Moreover, the work stoppage herein clearly did not involve employees' own wages and working conditions (as in *City Dodge Center,* 289 NLRB 194 (1998), enfd. sub nom *Roseville Dodge, Inc. v. NLRB*, 882 F.2d 1355 (8th Cir. 1989)), nor was it focused on their own specific job-related complaints (as in *Washington Aluminum, Co.,* 370 U.S. 9 (1962). It is therefore questionable whether the *First* Factor weighs in favor of protection at all, but certainly, it cannot reasonably be argued that it weighs "strongly" in the employees' favor.

2.    The *Second* Factor Does Not Weigh Strongly in Favor of Protection.

Similarly, neither the *Second* Factor ("whether the work stoppage was peaceful") nor the *Ninth* Factor ("whether the employees attempted to seize the employer's property") weighs strongly in favor of protection of the work stoppage. The Board states, in conclusory fashion, that the *Second* and *Ninth* Factors weigh

"strongly" in the Union's favor because the work stoppage was "peaceful." Once again, the Board oversimplifies the issue. Had Fortuna's employees seized or destroyed property, the work stoppage would be patently unlawful and there would be no need for further examination of the *Quietflex* factors. *See, e.g., NLRB v. Fansteel Metallurgical Corporation*, 306 U.S. 240 (1939) (holding that the employer could lawfully terminate the employment of employees who resorted to illegal seizure of the employer's buildings).

Indeed, one problem that plagues the Board's analysis is that it interprets the *Quietflex* factors as either for or against protection, without any appreciation for the nuances presented. The fact that this instant case does not involve the seizure or destruction of Fortuna's property ***does not mean*** that the work stoppage was peaceful. In this case, the instant work stoppage involved a group of between 77 and 100 employees chanting, yelling, and repeatedly and insubordinately refusing management's reasonable requests to relocate their protest off-property until they were directed to leave by the police. Had such conduct occurred in the Board Members' living rooms, they may well have had a different view as to whether it was "peaceful."

In any case, the facts of this case are easily distinguishable from the situations in which the work stoppage has been deemed protected. For instance, in *Roseville Dodge, Inc.*, there were only 26 employees who initially participated in

the work stoppage and "all but a few" left after they were first told to leave the property. The remaining employees left voluntarily after the president read a prepared statement threatening to fire them if they did not return to work or leave the property. Such a situation bears no resemblance whatsoever to the situation Fortuna faced in this case, which was obviously more hostile.

For these reasons, the Board erred in concluding that the *Second* Factor weighed strongly in favor of protecting the work stoppage.

### 3. The *Fifth* Factor Does Not Weigh Strongly in Favor of Protection.

With regard to the *Fifth* Factor ("whether the employees were given any warning that they must leave the premises or face discharge"), the Board acknowledges that the employees were warned that they would be suspended if they did not return to work or go home. Nevertheless, the Board concludes that this factor also weighs "strongly" in favor of protecting the work stoppage because Fortuna began suspending employees "only minutes" after warning them of the possible suspension. The Board's analysis ignores two pertinent facts. *First,* the Board fails to take into account that Fortuna ***did not discipline*** employees who returned to work or left the property after receiving the last and final warning. The suspended employees therefore had ample time to consider Fortuna's demands and, even after seeing the employer's response, chose to continue trespassing on Fortuna's property.

40

*Second*, before imposing any suspension, Fortuna directed the employees on **multiple** occasions over the course of an hour to return to work or leave the premises.  However, the employees responded to these directives with derisive chants and refusals to leave.  Because the employees gave no indication that they intended to accept either of the alternatives presented by management, and, in fact, gave every indication they intended to occupy the cafeteria indefinitely, the facts of this case are strikingly similar to those in *Waco, Inc.*, 273 NLRB 746 (1984). There, the Board determined that a work stoppage was not protected for the following reasons:

> The employees had had ample time to consider the respondent's demand that they choose between working and carrying on in their protest off the respondent's premises.  The employees gave no indication that they intended to accept either alternative, and, in fact, the employees' testimony indicated they had no plan to give up their occupation of the Respondent's lunchroom.

273 NLRB at 746-47.

Because the same analysis applies in this case, it is difficult, if not impossible, to conceive how the Board could have concluded that this factor weighs "strongly" in favor of protection.

      4.   The *Sixth* Factor Does Not Weigh Strongly in Favor of Protection.

As for the *Sixth* Factor ("the duration of the work stoppage"), in 2009, the Board cited the duration of the work stoppage as a reason it initially viewed this

41

case as "close." And yet, in its most-recent decision, the Board determined that the *Sixth* Factor weighed "strongly" in favor of protection.

To reach this result, the Board erroneously focused entirely on the fact that only an hour passed before the employees were suspended. The Board's analysis fails to take into account that the employees were merely suspended ***pending investigation***. The final decision to impose the five-day suspension was not made until the next day and was based on the fact that the employees remained on the property without permission for more than two-and-a-half hours. As such, once the duration of the work stoppage is properly viewed as lasting over two-and-a-half hours, it is apparent that this case is analogous to length of the ***unprotected*** work stoppage in *Waco, Inc.* 273 NLRB 746 (1984) (determining that work stoppage that lasted three and one-half hours was not protected).

Moreover, and completely ignored by the Board, the striking employees herein did not leave the cafeteria of their own volition, but in fact remained until ordered to disperse by the police, whom Hotel officials had been forced to summon. Had the police not been called, it is fair to assume that they would have remained in the cafeteria indefinitely.

At the very least, the duration of the work stoppage cannot be said to "strongly" weigh in favor of protection.

5.    The *Eighth Factor* Does Not Weigh Strongly in Favor of Protection.

The *Eighth* Factor ("whether the employees remained on the premises beyond their shift") also does not "strongly" weigh in favor of protection. While it is true that none of the employees engaged in the work stoppage remained on property after their shift, the employees were "on the clock" for much of the time they were engaged in the work stoppage. These employees blatantly overstayed their breaks after being repeatedly told to return to work. Indeed, the record shows that some employees, after being in the cafeteria for about 30 minutes, actually left in order to *punch in*, and then *returned* to the cafeteria. (Tr. 292, 301, 370-71,420, 1900-01, 673-87.) Given that the employees were not performing any work, Fortuna was more than entitled to require them to return to their stations, clock out and leave, or be suspended. Consequently, the Board erred in finding that the *Eighth* Factor weighs "strongly" in favor of protection.

6.    The *Tenth* Factor Does Not Weigh Strongly in Favor of Protection.

Lastly, the Board improperly determined that the *Tenth* Factor ("the reason for which the employees were ultimately discharged") "does not weigh against protection." The Tenth Factor is designed to distinguish between employers who discipline an employee for the lawful reason that they did not leave the property from employers who discipline their employees for the unlawful reason that they

refused to return to work. Plainly, the former employers are lawfully enforcing their private property rights, whereas the latter employers unlawfully limit employees' ability to engage in an off-site strike. *See Molon Motor & Coil Co.*, 302 NLRB 138 (1991), enfd. 965 F.2d 523, 528 (7th Cir. 1992) (employees' activity was protected where they were fired for refusing to return to work, rather than refusing to leave the employer's premises).

Thus, because the undisputed evidence in the record demonstrates that Fortuna disciplined the 77 employees who engaged in the strike because they refused to leave the property (G.C. Ex. 11), the Board erred by finding that Factor 10 "did not weigh against protection." The Board should have, in fact, determined that the *Tenth* Factor weighs in Fortuna's favor.

> 7.  The Board Should Have Determined That the *Quietflex* Factors
>     Favor the Conclusion that the Work Stoppage Was Not
>     Protected.

In sum, the Board erred when it rebalanced the *Quietflex* factors to preserve its previous decision. Seventy-seven employees occupied Fortuna's cafeteria to the exclusion of others for over two-and-a-half hours. Throughout the work stoppage, the striking employees knew that management would not be able to discuss the subject of their grievance because (1) Coonley was not present at the Hotel and Cook was busy assisting guests; and (2) Fortuna's confidentiality policy prohibited the company from discussing the particulars of an ongoing investigation

concerning an employee's discipline.  Nevertheless, the employees yelled, chanted, and insubordinately refused to heed the employer's repeated warnings to return to work or continue their work stoppage off-the-clock and off-property until forced to do so by the police.

The employees had ample time to consider Fortuna's demands to leave the property and gave the employer every indication that they intended to remain on the property indefinitely.  Because the instant work stoppage extended far beyond a "sincere effort to meet with management," the interference with Fortuna's private property is not warranted – particularly because the employer had an established and effective grievance procedure that employees had utilized on countless occasions in the past to resolve workplace disputes.  As such, taking into account all the facts and circumstances of this case, the only way to maintain both the employees' right to engage in concerted activity and Fortuna's private property rights is to determine that the on-site work stoppage is not protected.

**D.    Remand is Inappropriate in This Case**

It is well-established that "if the record before the agency does not support the agency action, if the agency has not considered all relevant factors or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation." *Fla. Power &*

*Light v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added). One of the "rare circumstances" in which remand is not appropriate and a Court of Appeals is entitled to rule on the merits occurs when the administrative record is fully developed and conclusions from the record are clear. *See, e.g., Sierra Club v. EPA*, 346 F.3d 955 (9th Cir. 2003).

In this case, the record before the Court consists of thousands of pages of trial transcripts and hundreds of pages of pleadings governing a discrete issue. It is respectfully submitted that the lawfulness of Fortuna's conduct is firmly established by this comprehensive record. Accordingly, the Petitioner is of the view that it would be a waste of time and resources to remand this case again, particularly in light of the length of time this case has been pending, the nominal amount in controversy, and the Board's previous result-driven decision-making, which, if past is prologue – and given the Board's apparent penchant for the "rebalancing" of an impractical multi-factor test – is sure to yet again be repeated should this Court remand the matter. Thus, Fortuna submits that this case represents one of the "rare circumstances" in which another remand would be inappropriate and urges this Court to specifically find that Fortuna did not violate Section 8(a)(1) of the Act by suspending the 77 employees who engaged in the on-site work stoppage.

## X.    **CONCLUSION**

For all of the foregoing reasons, Fortuna respectfully requests that this Court grant its Petition for Review, deny the General Counsel's Cross-Petition for Enforcement, specifically find that Fortuna's decision to suspend the 77 employees who engaged in the May 11, 2009 work stoppage did not violate Section 8(a)(1) of the Act, and remand the case to the Board with direction to dismiss the underlying Complaints.

Dated:  October 23, 2014

Respectfully submitted,

FORD & HARRISON LLP

By:  __/s/_____
Stephen R. Lueke
Stefan H. Black
Attorneys for FORTUNA
ENTERPRISES, L.P., A
DELAWARE LIMITED
PARTNERSHIP *d/b/a* THE LOS
ANGELES AIRPORT HILTON
AND TOWERS

## STATUTORY ADDENDUM

Relevant provisions of the National Labor Relations Act, as amended (29 U.S.C. §§ 151, et seq.):

**Section 2(2) (29 U.S.C. § 152(2)):**

(2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act [45 U.S.C. § 151 et seq.], as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

**Section 7 (29 U.S.C. § 157):**

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).

**Section 8(a)(1) (29 U.S.C. § 158(a)(1)):**

It shall be an unfair labor practice for an employer –

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

**Section 8(a)(3) (29 U.S.C. § 158(a)(3)):**

It shall be an unfair labor practice for an employer –

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act [subchapter], or in any other statute of the United States, shall preclude an employer from making an agreement

with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act [in this subsection] as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a) [section 159(a) of this title], in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) [section 159(e) of this title] within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

**Section 10(a) (29 U.S.C. § 160(a)):**

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [section 158 of this title]) affecting commerce.

**Section 10(e) (29 U.S.C. § 160(e):**

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceeding, as provided in section 2112 of title 28, United States Code [section 2112 of title 28].

**Section 10(f) (29 U.S.C. § 160(f):**

[Review of final order of Board on petition to court] Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside.

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| **FORTUNA ENTERPRISES, L.P.,** | * | |
| | * | |
| | * | |
| Petitioner | * | **Nos. 14-1099** |
| | * | |
| v. | * | **Consolidated with** |
| | * | **Case No. 14-1115** |
| **NATIONAL LABOR** | * | |
| **RELATIONS BOARD** | * | |
| | * | |
| Respondent | * | |
| | * | |
| **UNITE HERE LOCAL 11** | * | |
| | * | |
| Intervenor | * | |

### <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), Fortuna Enterprises, L.P. certified that its final brief contains 12,673 words of proportionally-spaced, 14-point type, and the word processing system used was Microsoft Word 2003.

Dated: October 23, 2014          FORD & HARRISON LLP

By: __/s/_____
     Stephen R. Lueke
     Stefan H. Black
     Attorneys for FORTUNA
     ENTERPRISES, L.P., A
     DELAWARE LIMITED
     PARTNERSHIP *d/b/a* THE LOS
     ANGELES AIRPORT HILTON
     AND TOWERS

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| **FORTUNA ENTERPRISES, L.P.,** | * | |
| | * | |
| **Petitioner** | * | **Nos. 14-1099** |
| **v.** | * | |
| | * | **Consolidated with** |
| **NATIONAL LABOR** | * | **Case No. 14-1115** |
| **RELATIONS BOARD,** | * | |
| | * | |
| **Respondent** | * | |
| | * | |
| **UNITE HERE LOCAL 11,** | * | |
| | * | |
| **Intervenor** | * | |

## CERTIFICATE OF SERVICE

The undersigned hereby certify that a copy of the foregoing Petitioner's Brief was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below.

**National Labor Relations Board:**     Richard F. Griffith, Jr.
General Counsel
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
(202) 273-3700

John H. Ferguson
Associate General Counsel
Division of Enforcement Litigation
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
(202) 273-2950

Linda J. Dreeben
Deputy Associate General Counsel
Jill Griffin
(202) 273-2949
Kira Vol
(202) 273-0656
Doug Callahan
(202) 273-2988
Edward Swidriski
(202) 273-2891
National Labor Relations Board
1099 14th St. N.W.
Washington, D.C. 20570-0001
(202) 273-3700

Mori Rubin
Regional Director
NLRB Region 31
11500 West Olympic Blvd., Suite 600
Los Angeles, CA 90064
(310) 235-7352

**Unite Here, Local 11**

Eric B. Myers, Esq.
Davis Cowell and Bowe, LLP
595 Market Street, Suite 1400
San Francisco, CA 94105
(415) 597-7200


Dated: October 23, 2014

FORD & HARRISON LLP


By: __/s/_____
      Stephen R. Lueke
      Stefan H. Black
      Attorneys for FORTUNA
      ENTERPRISES, L.P., A
      DELAWARE LIMITED
      PARTNERSHIP *d/b/a* THE LOS
      ANGELES AIRPORT HILTON
      AND TOWERS

WSACTIVELLP:7108851.1